Good morning, Your Honors. Good morning. John C. Ferry on behalf of Appellants H. Dan IZUMI and the NorthCon Partnerships. The case is a little bit smaller than when it was originally briefed. Hopefully the panel is aware that Hylands was dismissed. So I am here on behalf of Mr. IZUMI and NorthCon against Century Insurance. Counsel, is Mr. Bryant also going to address the court? He says briefly. Okay. So the 20 minutes is to be shared between you two. That's understood, Your Honor. All right. Thank you. All right. The two issues that are raised by Century, both in the summary judgment motions and here in their respondent's brief, are collateral estoppel and statute of limitations. Those are the only issues before the Court. Three of the elements of collateral estoppel are not satisfied by Century, and there are several exceptions that would apply in any event. First, but most important, is the issues are not identical. The issue below in the appellate district court was whether the policy issued by the indemnity company, and, Your Honors, there were three insurance companies, each of whom had the name industrial in their title, that issued separate policies. The particular one I'm referring to is the excess indemnity policy that, according to the ABC, was a claims-made policy that applied to the year 1983-1984. So the issue before the appellate court was whether there was coverage or a defense obligation under that policy for the appellants. The issue here is whether the Century policy, which is an excess policy of four years, we are arguing, that has excess over 11 total, 11 different insurance policies provide a defense or indemnity for appellants for the years 1983 to 1987. So the issues are not identical. The companies that issued the insurance policies are not identical. The insurance policies are not identical. The years in which the claims arose or the occurrences took place are different, four different years. The policy language in all of these policies is markedly different. Ginsburg. Well, I'm glad you asked. One of the arguments that's been raised in this case, and I'm going to say it again, is that there is a difference between the Federal policy and the Century policy. Is that what it is? No. I was going to tell you that I was going to structure it this way, Your Honor. One of the arguments that Century is making is they seem to concede, you may not hear, but they seem to concede that the indemnity policy, which was only in place for one year, obviously could not any issues arising under that policy would not be precluded in the other policy years, but that there was another industrial policy issued by another industrial company called Underwriters in two succeeding years, over which Century was excess. Well, I thought it was a very simple question, and I just wanted to follow the answer you're going to give Judge Rawlinson. Why don't you answer her question, and then I'll follow up later. Sure. The difference between the Underwriters and the indemnity policies, which is the hook upon which Century handles and hangs its case, the indemnity policy, 1983-84, covered only two of the SACOR partnerships. There were, I think, five partnerships altogether. They were created in successive years. So the indemnity policy, 1983-84, only covered the partnerships that were in existence when that policy was applied for in late 1982. The Underwriters policy provides coverage for all of the partnerships, all five partnerships, plus the SACOR company, which was an independent corporation. But why does that make a difference in terms of the collateral estoppel issue if the language of the policies were the same, if they follow form? Why does that make a difference? Because the issue, then, is not the same. Because the issue is not the same. Why not? Because the issue is whether there was, and there are several other differences I'm going to get to, but the issue is whether the appellate court, the first court, determined that there was coverage under this particular policy provision for this particular policy year. What difference does that make if the language is the same in the policies? If the court determines that policy A does not apply and policy B contains the exact same language or follows the form of policy A, how can that be a different ruling if the policies have the exact same coverage provisions or substantially the same coverage provisions? Correct, Your Honor, and they do not, and that is my point. The industrial and the indemnity policies do not have the same coverage provisions. They apply to different insureds. The determination of who is an insured and what capacity you were sued is different. In the indemnity policy, the 1983 policy, it applies only to partners and their liability as such. The 84 and the 83. What language, what page on the excerpts of record are you relying upon to make the distinction between the covered parties? I don't have that right in front of me. It's in our brief. That's crucial, because in the brief, it appeared to me that you were extracting language and not including language either above or below the language that you were using. That's why I thought it was important to pinpoint exactly the language you are relying upon in your argument. Okay. It gets confusing, Your Honor, because we are comparing several different policies. And I apologize for that, Your Honor. The third distinction is that the indemnity, the underwriter's policy, the later policy that was not considered by the appellate court, has a cross-liability provision which expressly permits suits between insureds, and the indemnity policy does not. And one of the main arguments made by the SACCOR trial court, as well as the Third Appellate District, was that you cannot have suits between insureds.  The policies that you say allow suits between insureds? Underwriters. Which underwriter's policy? It's called the industrial underwriter's. Industrial underwriter's. That was the excess policy, in effect, in 84-85 and 85-86. And what provision in the ñ in that policy expressly allowed suits between insureds? There is a clause in the policy, and I apologize, Your Honor, I don't have the page here. Counsel, that doesn't help us. If you tell us that there's a clause in the policy and you can't pinpoint us to ñ this record is very confusing and it's voluminous, and if you can't pinpoint us to the part of the record that you're relying upon to support your argument, that doesn't help us very much. I thought we had it stated in the brief, Your Honor. I thought we had quoted the language in the brief. Do you have your brief that you can find the reference? While we're looking that up, let me move to the second element, which is that the issues have to be actually litigated, and that's related to the question that they have to be necessarily determined. The issues before the Third Appellate District were not whether the century policy provides a defense or indemnity. The issue before the Third Appellate District was not whether the underlying policies to Century, to which it follows form, including the Gibraltar policy, provided coverage. Those issues were not ñ everyone admits that those issues were not addressed by the Third Appellate District. So no one can argue that they were actually litigated. So for that reason, Century has argued that they were necessarily determined in order for the Third Appellate District to reach that conclusion. However, the Century policies are above and follow ñ and drop down and follow form to the Gibraltar policies. Now, the Gibraltar policies, which were issued in the first two years, 83 through 85, are extremely broad-form, old-fashioned, all-risk, Lloyd's-type policies that provide coverage anywhere in the world essentially for anything. Now, the indemnity 83 policy, which the Appellate District Court said was a claims-made policy, which we put in our brief, means that only claims that arose between April 1st, 1983 and March 31st, 1984 can be covered under that policy. So any occurrence or claims that were made after that could not have been covered under that policy, so it was not necessary for the appellate court to consider or to determine whether any of those claims would have triggered coverage under indemnity. Thus, it's the time distinction between the two years, the three years, that's relevant. The second reason why it was not necessary to consider the Century or the ñ any of the other Gibraltar policies is that the original indemnity policy, the one considered by the appellate court, had a very narrow coverage grant. The Gibraltar policy, as I said, which we quote in our briefs, has a much larger coverage grant. Think of it in terms of consentive circles. The smaller indemnity policy provides coverage for a very small area. The larger Gibraltar coverage is ñ the Gibraltar policy covers a much larger area. Thus, it was not necessary for the appellate district court to consider whether an event that would trigger coverage out here in the Gibraltar policy triggered coverage under the indemnity policy, because it obviously didn't, but they didn't need to reach that determination. They only needed to focus on where the policies were the same. And that's even assuming that they even considered the Gibraltar policy, and there's no evidence anywhere that they did. Now, there are several reasons why collateral estoppel should not be applied. One is that there was a significant change in the law. The appellate ñ the Third Appellate District Court relied on the Malazzo decision, which was an indemnity case that came to judgment after a jury determination of liability. And it ñ the court relied on that to reach the conclusion that there cannot be suspended damages between insurers, because anyone acting in the ñ no one could be acting in the capacity of an officer or director of a corporation and do something antagonistic to the corporation, that that is not covered. Well, after that decision, the Barnett decision was handed down, and it was later followed by this circuit in the Pension Trust case. The significance of those cases are that you have to look at what the actors were actually doing when they were performing the acts that gave rise to the later claim of damages. You have to decide whether or not they were actually acting within the best interests of the corporation. And it's not automatically excluded. And as I said here ñ I'm sure you're going to be turning your time over to your co-article soon, and I want to make sure I have an opportunity to ask a question. Could I interrupt you just to tell you what I would like to know? I want to know whether the indemnity policy incorporates all of the same issues terms as the Gibraltar policy, or whether the Gibraltar policy is broader than the indemnity policy. That's a specific question I'd like to have your answer, and if you have an answer, I'd like to know where I can look in the record to determine it. All right. There are two different years here. First, the indemnity policy is only in place in 1983 and 1984. The Gibraltar policies are in place for two years. My first question is, is the indemnity policy incorporate all the same terms as the Gibraltar policy? Is that yes or no? No. It's no. And so your position is the Gibraltar policy is broader. Correct. Okay. Now, in what regard and where would I find it in the record? In what regard? I will look that up while counsel is speaking, if I may, and give you the pages when I'm back up for rebuttal. But let me just say first that the policy chart that we included in our brief, which is a recitation of all the policies that were issued, was created by the Council for Ball Construction Company, which is the corporation for whom all these policies were issued. His declaration is included in the record supporting those policies. So I was saying that there's been a change in the law, a significant change in the law, because now it's recognized that there can be suits between officers and directors or partners of the same corporation, but they're not automatically excluded by an insurance policy. That was not the case before the ADC. And that is the Habella case that I referenced in my letter to the Court, which is a New Jersey decision from last year, I believe, that very complementarily points to the Barnett decision and the Pension Plus decision. Counsel, what language are you relying upon in the Barnett decision to support your argument? The parties in Barnett, the corporation, and Mr. Barnett was an officer of the corporation. I understand, but could you point me to the specific language in Barnett that you are relying upon to support your assertion? That it is no longer the law that insured cannot be covered for suits against each other. I apologize. I will look that up for you, Your Honor. It's in that decision. The Barnett decision refers to Malazzo, since Malazzo is disfavored because it viewed it only as an indemnity case where after the determination had been made as to what role the parties were acting. Barnett was not, and that's why the Court indicated that you have to wait, get the benefit of the doubt, and consider what the potential is for what role they were acting in. And I think I better reserve my time here. Mr. Barnett, would you like to address the Court? I mean, Mr. Bryant, would you like to address the Court? I'm just going to join Mr. Ferry's remarks. All right. Thank you. Counsel. You may proceed. If I ask you the same question I ask your adversary of whether the indemnity policy incorporates all or the same terms as the Gibraltar policy, what would you answer be? It would be yes. It is an umbrella policy. It incorporates the terms of the two underlying policies below it. And my name, by the way, I am Louis Castoria representing Century Indemnity today, Your Honor. And may it please the Court, we'd like to divide our time, if possible, close to half and half between myself and Mr. Rice appearing for Continental. Your position is the Gibraltar policy is broader than, is not broader than the indemnity policy? It is of a different type. It is not broader than the indemnity policy. The Gibraltar policy was a property policy. I assume that was your position, but I'm having difficulty looking at the record specifically to read it for myself. I understand what counsel tell me in the briefs, but I sort of feel an obligation when there's a difference of opinion to go look at it myself. I understand. I have the excerpt of record, but I haven't been able to see identification of your position or counsel's. Could you tell me specifically where I go look? Candidly, no, Your Honor. I'm sorry? Candidly, no, Your Honor. The excerpts of record in this case come from policies dating back to the 80s. In many cases, the policies were incomplete. They were the versions used throughout the litigation were, if I may say, cobbled together as best they could be by brokers, by people at Baugh Construction and, to some extent, the carriers. But I don't believe there is a single document in the excerpts of record in this case that would allow Your Honor to reach the conclusion that declarants have reached about the scope of coverage. How about your position? Is there a document or documents that we can go to, to compare and contrast for ourselves to determine whether or not the policies are substantially the same or substantially different? That's crucial to our determination of this case. Your Honor, the policies themselves, I don't have the citations to the excerpts of record of where the policies are. How are we supposed to resolve this case if the parties are here to help us resolve the case? It's your case. You presumably know it better than we do. Of what assistance are you to us if you can't point us to the record as to how we can resolve this case? I believe I can help the Court, Your Honor. Would you please? In the SACOR consolidated litigation, decided quite some time before this case and started before this case, there were a number of underlying suits that were brought together, consolidated, which went to both the underlying liability and the coverage. At that time, the same court, with all the record in front of it that was then available, looked at all the policies, came to a determination that Mr. Bryant, Mr. Rizzumi were not good. We appreciate that, counsel. But our role at this point is to determine whether or not that decision binds the parties now. In order for us to make that determination, we have to gauge whether or not the same issues were involved. And we cannot determine that unless we know whether the policies were the same. We have to look at that independently. We can't take the Court's word for it. Otherwise, there would be no reason for us to review it. Handedly, Your Honor, I don't believe there is a reason for this Court to review this case. Well, we've been charged to do it. Well, the the California court in the SACOR reached its determination. It was taken up on appeal. It was affirmed. This isn't a challenge. That may well be, but I assume you understand that we have to oversee what the district court found in this case, and that's our obligation, and that's why you're here. Now, the Gibraltar policy, was the Gibraltar policy determined, the effect of the Gibraltar policy in the State proceeding? My understanding, Your Honor, is no. The Gibraltar policy was not finally at issue at the time the SACOR case went to trial. Gibraltar settled. So the State court decision is not going to help us on this precise issue that we're asking you now. Except to this extent, Your Honor, with an umbrella policy, the only way you can tell what it covers is to look at the policies below it to which it follows form, that that language comes up to the next layer. That's right. If they're the same in form, then Century's excess policy is going to get, arguably, is going to get within the collateral estoppel. But we have to determine whether it's the same in form. Now, the excess policy of Century, I assume it's a Century policy, is around some place and must have been in the record of the district court, or the district court had no basis upon which to make its determination. So I assume it's there. And I assume the industrial policy is around. And I don't understand, maybe I'm missing something, but I don't understand why counsel can't give us the actual language or point it to us so we can go read it. Your Honor, the excerpts of record at pages 315 to 317 show that the SACOR trial court and appellate court looked at the exact policies which that court had in front of it. What if we want to look at it ourselves? Well. Is it in the record of the district court? Your Honor, I believe the answer is yes. We laboriously put together all of the underlying lawsuits and all of the policies. Those were before the district court. We did not ---- It was before the district court but not included in the excerpt? I believe they're not included in the excerpts of record. To me, the issue, Your Honor, and to Century, the issue is whether Judge Hamilton in looking at what is essentially a collateral attack on a State court judgment and a State court appeal was entitled to look at the record then in front of her and reach two conclusions. One, these are the same people making the same argument under the same policies or policies issued in the same line of coverage year to year who did not bear their burden, and it is the plaintiff's burden in a coverage case to bring their claim within coverage, did not meet their burden to show that they were covered under any of these policies, or that there was different policy language that would compel a different result. And secondly, though the judge did not base her ruling on this, she was correct on the second ground, the statute of limitations, that this is a dispute that went back, pardon me a moment. Well, I understand what you've just told me, I think. But collateral estoppel is a separate affirmative defense that's raised. And the decision was made by the district court on the basis of collateral estoppel. So that was your burden. And we have to look to see whether or not the district court was correct that collateral estoppel applied. Now, if the district court was incorrect, had the wrong policy, quoted the wrong language, then we would reverse it. So it seems to me, although the district court may have had the policies in front of the court at the time, that doesn't help us in the review. Your Honor, I don't believe that as appellees, it's our burden to bring to this court different policy language. Well, I think on this issue, it was your burden to prove collateral estoppel. If the problem is that collateral estoppel was that you didn't meet your burden, then we would reverse. Don't you think you had the burden as a separate affirmative defense to show collateral estoppel? Your Honor, candidly, no. It is an affirmative defense. But collateral estoppel doesn't mean let's go back, look at the original record in the earlier proceeding and see if the court was right. Collateral estoppel means the court was right. The court has decided between these parties, as it says, there is no coverage. But the problem with that statement is that the court had to find that they were similar in form between the primary coverage and the excess coverage. And that was not decided in the State court. So the application of the State court decision relied upon that analysis. And what we're trying to do is to find out if the district court was correct in applying collateral estoppel. And that has to do with the difference whether they follow the form from the excess carry to the primary. Now, how do we find that out? How do we check on the district court to make sure that the district court was correct in that application? Off the top of my head, parties could be ordered to augment the record on appeal. The only other way that occurs to me at this stage, Your Honor, is to say that the parties wishing to change the trial court's ruling on the subject bear the burden to show where the changed language is. Where is the changed policy language? All the policy language that was before the court below, which has been addressed in the briefs and in the excerpts of record, which is not everything, is the policy language is consistent. They've not shown anything to deviate from that. So what, then, is the court to do with this case? Well, I have a simple answer, which is it's a case that's been kicking around since roughly 1984 when the first of the underlying lawsuits were filed. The appellants have had every conceivable opportunity, including an incredibly long proceeding in the SACOR coordinated case, to bring anything forward to show a different result. They got shot down. They got shot down on appeal. Judge Hamilton gave them every opportunity to bring forward some new evidence to show that a different result should obtain. They didn't do it. And I don't believe this Court has the burden to say, well, could they have come up with something else? After all, this was a summary judgment. But we're not asking anyone to come up with anything else. We just want to know what the district court had before it, when it made the ruling. We're just asking for the records. We're not asking for anything new, just the record. All right. I don't believe the Court has a complete record to do that in the record on appeal. There was a complete record in the district court. I would, if I may, may I vote or delegate my time to co-counsel, who has separate arguments to make, and simply say we do believe the Court was also right on the statute of limitations argument, but that's not what the Court chose to rule upon. All right. Thank you, counsel. Thank you. Oh, and if I may, Barnett was not a change in the law from Malazzo. The two cases are not adverse to each other in terms of being a change in the law. You're keeping your voice down. You need to raise your voice. Where's your point? Good morning, Your Honor. I'll try to keep my voice up as well with a cold. That's not a microphone. It's a recorder, and people get fooled by that. Okay. David Rice, Your Honor, on behalf of Continental Casualty Company, appellee here. Your Honors, if I may follow up on what Mr. Castoria said somewhat before I get to the issue of written tender, which, as the Court knows, was the district court judge's basis for ruling with regard to Continental. Continental did not raise collateral estoppel because, in large part, because it issued a policy that came significantly later than the policies that Century issued. Continental's policies did not go into effect until 1986, April of 1986, well after as Mr. Bryant himself has characterized it. The hostilities between these parties were well underway. In fact, they were suing each other. The business dealings had completely fallen apart. Nonetheless, although that was not a basis for the Continental's ruling, the underlying decisions upon which the collateral estoppel arguments are based apply equally to Continental. The policy terms in Continental's two policies, primary and excess, are identical to the policy language discussed in by Judge Lewis in the Sacramento Superior Court and Justice Scotland in the opinion affirming that. And Mr. Bryant made all the same arguments there based on the same factual record and the same law, and those arguments were carefully considered and rejected by that Court. So I would submit that while we, Continental, are not arguing that this Court's obligated on collateral estoppel grounds to follow that opinion, those opinions really answer all of the contentions being made by Mr. Bryant here, and particularly Justice Scotland's opinion on behalf of the Third District Court of Appeal in Sacramento. Your Honors, I should point out also that the claims here, the only person making claims against Continental at this point is Mr. Bryant. Mr. Zumi has abandoned his claims, and he's only making claims with regard to the two Continental policies, not the transcontinental policy, which he's also abandoned his claims with regard to because he didn't sue transcontinental. That's undisputed. And his only basis at this point for claiming coverage under the Continental policies is that he was, quote, a real estate manager for a named insured. And I do just want to point out, and this goes back to the opinions of both the Sacramento Court opinions, that there are five elements, and this is undisputed, that he has to establish to show that he's covered, and he's got to show, he's got to point to an allegation that alleges one, and another allegation that alleges another. I think these five points are undisputed, that he was a real estate manager. That he was? That he has to point to an allegation that he was a real estate manager, which this Court's tailhook decision, among other things, casts severe doubt on, that he was a real estate manager for a named insured. And the only named insured under Continental's policies are the BAW entities, not any of the later partnerships that entered into deals with Mr. Bryant. He has to have been, he has to have an allegation against him in his capacity as a named insured. So it's not enough that he was, that he was a real estate manager. He's got to have an allegation against him because of his duties as a real estate manager for a named insured. Fourth, very importantly, it has to have resulted in covered claims. These are general liability policies. All of these policies, they cover bodily injury, property damage, advertising injury, and personal injury, and that's it. This is a classic Waller case, and I'm referring to Waller v. Truck, which is the California Supreme Court's decision that says general liability policies don't cover economic disputes between business parties. And it doesn't matter if you got upset because of the dispute and had emotional damages or even a bodily injury. If it results from economic loss, they're not covered. So he has to establish that there's an allegation alleging some kind of covered loss, not simply economic loss. And fifth, and I've already alluded to this, it has to have happened during Continental's policy period. Continental didn't issue policies until these parties were at each other's throats already. And, in fact, this issue was already before this Court in a related way through Judge Patel's decision with regard to the claims brought by the law entities. Those are actually the named insureds under Continental's policy. Kennedy. Was this the basis upon which the district court found in your favor?  And this is why don't you get to the end of it. This is the actual issue we're going to review, then. Okay. Although I point this out because, obviously, this is important background and the Court can affirm on any basis supported by the record. And these were all arguments we made below. But let me turn to the written tender offer, which was a very simple ground. The Court said whatever may have happened here with regard to whatever coverage may have been involved here, you have to submit written tender per the at some point written tender per the insurance contract. This is not a late notice case. This is a case of no written tender whatsoever. And that's what the policy called for. California law is clear that this is Mr. Bryant's asking for a duty to defend, but there's no duty to defend until you tender your claim, until you ask for it. And these policies require that that request be in writing. And just to quote the California Court of Appeal in the Truck v. Unigard case, a 2000 case, quote, Absent tender, it is difficult to understand what, if anything, Unigard was supposed to do. There was never any written tender in this case. At one point, Mr. Bryant alleged that he did offer written tender, but he has abandoned that claim on appeal. And, in fact, all of the letters he alludes to were to other carriers or predated the Continental policy. And I should point out, Mr. Bryant knew very well how to submit written tender. At pages 665 and 670 of the insurer's excerpts of record are letters by Mr. Bryant to insurance companies, and they're called he titles them written tender. So he knew how to ask, he knew how to submit written tender to insurance companies when he wanted a claim. The tender, sole tender, written tender in this case, if he wants to try to call it, that is his lawsuit filed against my clients in the Northern District of California. And as a matter of law, that can't be – that can't and shouldn't be sufficient written tender when you have a contract that specifies that before you sue us, you have to submit written tender of a claim, give us a chance to evaluate it, and do whatever we need to do. But so prejudice has nothing to do with this. It is true under California law, a late notice claim requires that you – that the insurance company, before denying the claim, show actual prejudice from the late notice. But whether the notice is late or not, you at some point, as the insured, need to ask for coverage, and you need to ask for it in writing under this policy. Not all policies require written tender, but these did. The two Continental policies at issue here did. So on that basis, Your Honor, which is the – which was the district court's ground for granting summary judgment, the Court should affirm. It should also affirm on the independent ground, which is fully supported by the record and was argued below, that tender or not, there simply was no coverage for Mr. Bryant under these policies. Unless the Court has any questions, I would submit. Thank you. Thank you. Thank you. Rebuttal. Yes, Your Honor. I have answers to some of your questions. I also just want to point out that at page 74 in the record, we – we include the opinion of Judge Mason, one of the SACOR coordination judges, who found that the allegations that were presented against all of the – the appellants, including the co-defendants in that case, raised court issues, and it was not a Waller case. I also would take a little bit of umbrage at counsel's suggestion that we abandoned – that as Mr. Izumi abandoned the appeal with Continental, we reached a resolution of our dispute. You asked about Barnett on page – well, first, the cross-liability provision of the underwriter's policy is on page 15 of the record. The Gibraltar policies that have the entirely different, incredibly broad language are between pages 95 and 101 of the record, and specifically, the language that we quoted in the brief is on pages 97 and 98. And in the brief in our section where we discuss the policies, we quote the language and refer it to the record. Now, counsel's comment that some of these policies were not complete, that would undermine his collateral – his burden of proof to show collateral estoppel, because then he cannot show that the policies were identical. I believe that the record before the district court was complete with regard to the policies to the extent that we have them and that they have been incorporated in the record that is before the court. If counsel disagrees with me, then I would suggest that that means that there is a disputed issue of fact that would have precluded the district court from reaching a determination that there was collateral estoppel. The parties seeking collateral estoppel is a heavy burden. It can't be based on conjecture. It has to be based on actual fact, actual proof of the identicality of the issues and actual proof that they were actually litigated. Page 41 of our brief quotes the language in Barnett. And it cites the language in Barnett.  Ginsburg-Gilmore. Counsel, before we go any further, you cited us to page 15 of the record, which is a cross-liability endorsement. Now, you're saying this language shows what? That's the language. If you look at the bottom of the page, you will see it says industrial underwriters on the lower left. Right. That's the provision that was in the second policy, the underwriters policy that was in effect from 1984 to 1985, that was not considered by the lower court, that was not in the policy, the indemnity 83 policy, that was considered, if that's clear. So you ask me where I can prove that the policies were different. Here's one of them. The other places I can show that the policies were different are the specific language in the Gibraltar policies that I just gave you a moment ago, page 97 and 98, has the coverage provisions, the named insured provisions, and it has this incredible language that says, we will cover any allegations, we will defend you for any allegations made against you. Not you don't have to prove that they're claims. Which paragraph are you reading from? Which page and which paragraph? I'm sorry. I was reading from memory, Your Honor, but. Page 97, under insuring agreements, subparagraph 1A, about in the middle, it says, sustained or alleged to have been sustained during the currency of the insurance and arising from any cause whatsoever out of the operations, et cetera, anywhere in the world connected with the insurance business. Are you comparing this to the casualty? I'm comparing it to the 83 indemnity policy, which just doesn't have this language in it. I can't point to you because it's not there. But this is a dramatically different scope of coverage. And that's the point where I was trying to make with the concentric circles. You can find that there is coverage here under these policies which drop down that you don't have to reach in order to get the tighter coverage in the 83 indemnity policy, which was the only policy. And that's what I was trying to make with the concentric circles, which is the only policy before the appellate court. I want to respond to the statute of limitations. In a duty-to-defend case, the duty to defend is a continuing obligation. The statute does not begin to run until there's been a determination of indemnification. We file the suit timely based on the underlying SACOR determination. The cases advanced by century in their brief are first-party cases. Of course, if you're denied a disability benefit or if you're in an accident or your roof caves in, you know when it happened, you know when the statute begins to run. That's not the case in a third-party defense case where the obligation on the carrier to defend continues. Because the obligation continues, the statute does not begin to run until after a determination of liability has been made. And in our brief, we cite to the cases to support that proposition. All right, counsel, you have exceeded your time. Oh, I thought it was getting higher.  Thank you very much, Your Honor. Thank you to both counsels. The case just argued is submitted for a decision by the Court. Final case on calendar for argument is Mirna v. Mirna.
judges: Wallace, Rawlinson, Bybee